

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-9-2001

# Pinho v. Immigration & Naturalization Service

Precedential or Non-Precedential:

Docket 99-5844

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Pinho v. Immigration & Naturalization Service" (2001). *2001 Decisions*. Paper 101.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/101

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 09, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5844

FERNANDO PINHO and MARIA PINHO,

    Petitioners

v.

IMMIGRATION & NATURALIZATION SER VICE (INS)

    Respondents

PETITION FOR REVIEW FROM AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

(D.C. No. 0090-1: A71 643 458)
(D.C. No. 0090-1: A71 643 460)

Argued April 10, 2000

Before: NYGAARD, ALITO, and GIBSON,* Cir cuit Judges.

(Filed: January 31, 2001)

John D. Perez (ARGUED)
Tous & Perez, P.C.
838 Broad Street
Newark, NJ 07102

 Attorney for Appellants

_____
* The Honorable John R. Gibson, United States Court of Appeals for the
Eighth Circuit, sitting by designation.

Heather Philips (ARGUED)
David W. Ogden
Richard M. Evans
Nancy E. Friedman
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

 Attorneys for Respondents

OPINION OF THE COURT

JOHN R. GIBSON, Circuit Judge:

Fernando and Maria Pinho petition for r eview from an adverse ruling by the Board of Immigration Appeals (Board). The Board dismissed the Pinhos' appeal from an immigration judge decision denying suspension of deportation. The Pinhos contend that they satisfied the eligibility requirements for suspension of deportation at the time they filed their application and at the time the judge heard their case; that due to a long delay in their appeals process, which was beyond their control, they were unfairly held to a retroactive application of an amendment to section 240A(d) of the Immigration and Nationality Act, 8 U.S.C. S 1229b(d) (Supp. IV 1998); and that the current immigration law confers benefits on certain classes of aliens in violation of the equal protection component of the Fifth Amendment's Due Process Clause. We affirm.

I.

In August 1984, the Pinhos came to the United States from Portugal with their three childr en as non-immigrant visitors and remained until December 1990. At that time, they returned to Portugal for not mor e than three weeks, where they sought unsuccessfully to obtain immigrant visas. Upon their return to the United States in January 1991, the Immigration and Naturalization Service (INS) served the Pinhos with orders to show cause why they

2

should not be deported for having entered the United States without inspection, thereby instituting deportation proceedings against them. At the time the orders to show cause were served, the Pinhos did not have seven years of continuous physical presence in the United States. However, they had been continuously physically present in the United States for more than seven years when their case was heard on January 6, 1992.

Mr. Pinho continues to operate a concrete business he established in 1986 and employs others in his community. The Pinhos have strong ties to their community. Their children were educated here, and they own real estate in this country.

On January 6, 1992, the Pinhos appeared before the judge, conceded deportability, and applied for suspension of deportation under section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. S 1254(a)(1) (1994) (repealed by the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, S 309, 110 Stat. 3009-615 (1996)), or, in the alternative, for voluntary departure. Immigration and Nationality Act S 244(a)(1), as it existed at the time, authorized the discretionary relief of suspension of deportation if the immigrant met three criteria: seven years continuous physical presence in the United States, good moral character, and extreme hardship. The immigration judge denied their application for suspension of deportation based solely on his finding that deportation would not cause extreme hardship. The judge specifically stated that the Pinhos had lived in the United States for more than seven years, thus satisfying the continuous physical presence requirement as it then existed. Without specifically ruling on the issue of good moral character, the judge found no evidence that the Pinhos failed to meet this requirement. The judge granted the application for voluntary departure and ordered that the Pinhos be deported if they did not voluntarily depart the United States within the time allowed.

The Pinhos appealed the denial to the Board, which took no action on the appeal and had no communication with the Pinhos for the next six years. In March 1998, the Board requested supplemental briefing to address changes in the

immigration laws that occurred while the Pinhos' appeal was pending. The Pinhos submitted their supplemental brief in April 1998.

On September 14, 1999, the Board dismissed their appeal, applying the new stop-time rule of section 240A(d) of the Immigration and Nationality Act, 8 U.S.C.S 1229b(d) (Supp. IV 1998), which was enacted after the judge's decision. The Board concluded that the newly enacted law provided the eligibility criteria to be applied to the Pinhos' application for suspension of deportation. This petition for review followed.

II.

We review only the decision of the Board, and not the immigration judge's ruling. See Green v. INS, 46 F.3d 313, 320 (3d Cir. 1995). The only question before us is whether the Board properly applied the new continuous physical presence requirement (the stop-time rule) to the Pinhos' pending deportation proceedings. We conclude that it did.

Before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (often referred to as IIRIRA, but we believe clarity is served by referring to it in this opinion as the Reform and Responsibility Act), suspension of deportation was a form of discretionary relief available to aliens who had been determined to be deportable and who met certain statutory criteria. See 8 U.S.C. S 1254 (1994) (repealed 1996). The general requirements were continuous physical presence in the United States for seven years, good moral character, and extreme hardship. Id. After the alien had established these elements, the Attorney General had discretion to grant or deny the relief. Id.

The Reform and Responsibility Act, which over hauled the process of excluding or removing aliens from the United States, abolished suspension of deportation. Pending deportation proceedings were generally excluded from the Act's changes, see Reform and Responsibility Act S 309(c)(1). However, certain provisions were made applicable to all pending and new cases.[1] One of those
_____

1. Congress set out transitional rules to specify how the Reform and Responsibility Act was to apply to cases pending on that Act's effective

4

provisions is the stop-time rule of section 309(c)(5) (codified at 8 U.S.C. S 1229b(d) (Supp. IV 1998)), which changed how the continuous physical presence test was calculated. The old rule provided that the seven-year period was counted from the date the alien entered the United States until the date of application for suspension of deportation. 8 U.S.C. S 1254(a)(1) (1994) (repealed 1996). The new stop-time rule stops the counting period on the date the alien is served with an order to show cause why he or she should not be deported. Reform and Responsibility Act S 309(c)(5); 8 U.S.C. S 1229b(d)(1) (Supp. IV 1998).

Uncertainty existed in the interpretation of Reform and Responsibility Act S 309(c)(5) because it stated that the new stop-time rule applied to "notices to appear issued before, on, or after" enactment of the Reform and Responsibility Act.2 This language created ambiguity as to whether pending deportation proceedings were actually covered because all deportation cases were initiated with an or der to show cause and not a notice to appear. In Matter of N-J-B-, Interim Decision 3309 (B.I.A. 1997), the Boar d examined section 309(c)(5) and held that the stop-time rule applied to applications for suspension of deportation pending on the effective date of the Reform and Responsibility Act.3 The Attorney General vacated that decision and certified the question to herself for review. The question was settled when Congress passed the Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Pub. L. No.

_____

date. See 8 U.S.C. S 1101 note "Ef fective Date of 1996 Amendments" (Supp. IV 1998).

2. Pre-Reform and Responsibility Act charging documents that began deportation proceedings were known as Or ders to Show Cause. As part of the change in the overall scheme of immigration law, Congress changed the name of the charging document and the government actions vis a vis immigrants. The charging documents are now called Notices to Appear, and deportation is now called r emoval. 8 U.S.C. SS 1229 (Supp. IV 1998).

3. The Board came to that conclusion by interpreting the phrase to refer generally to charging documents initiating pr oceedings in the nature of deportation or removal, and not exclusively to the documents entitled "Notice to Appear."

5

105-100, 111 Stat. 2160 (1997).4 Following enactment of NACARA, the Board again was presented with the same question and upheld its earlier interpretation of section 309(c)(5), concluding that NACARA clarified that the Board's holding that the stop-time rule applied to orders to show cause in Matter of N-J-B- was corr ect. In re Nolasco-Tofino, Interim Decision 3385 (B.I.A. 1999); see also Rivera-Jimenez v. INS, 214 F.3d 1213, 1217 (10th Cir. 2000).

Both the plain language of NACARA and Board pr ecedent state that the stop-time rule applies to suspension of deportation cases. The Pinhos challenge on two bases the constitutionality of this law as applied to them. First, they argue that the retroactive application of the stop-time rule denies them procedural due process in violation of the Fifth Amendment. Second, they argue that the exceptions for certain classes of aliens violate the equal pr otection principles of the Fifth Amendment's Due Process Clause.

A.

The question of whether to accord retr oactive effect to a statute is determined by the Supreme Court's rule in Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994). The multi-part analysis begins with determining whether Congress has expressly addressed whether the statute is to apply to pending cases or only to new cases initiated after the statute is enacted. See id. Since the transitional rule with regard to suspension of deportation, Reform and Responsibility Act S 309(c)(5), 8 U.S.C. S 1101 note (Supp. IV 1998), itself states when it is to take ef fect and what cases are covered by it, there is no need to resort to the presumption against retroactivity. Id. Cf. Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998) (clear and unambiguous plain language of a statute obviates need for further inquiry).

Section 309(c)(5) of the Reform and Responsibility Act, as modified by section 203(a)(1) of NACARA (T ransitional Rules

_____

4. Section 203(a)(1) of NACARA amended Refor m and Responsibility Act S 309(c)(5) by replacing the term"notices to appear" with the term "orders to show cause." See infra at 8.

6

With Regard To Suspension Of Deportation), states in relevant part that "section 240A(d) of the Immigration and Nationality Act (relating to continuous r esidence or physical presence) [the stop-time rule] shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act." The Reform and Responsibility Act was enacted September 30, 1996 and took effect April 1, 1997. NACARA's amendments to it were ef fective "as if included in the enactment of [the Reform and Responsibility Act]." NACARA S 203(f); 8 U.S.C. S 1101 note (Supp. IV 1998). The plain meaning of these statutes establishes Congress's intent to apply the stop-time rule to all cases, including those pending as of September 30, 1996. NACARA S 203(f).

The Pinhos' orders to show cause were issued on January 7, 1991. Their case was decided by the Boar d September 14, 1999, well after the transition rules took effect. Although the Pinhos satisfied the continuous physical presence test as of the date they applied for suspension of deportation, the Board held that the law to be applied was the one in effect at the time of its review because the Act said it was to apply to pending cases. Since the Pinhos could not demonstrate physical pr esence of seven years in the United States from the time of their entry until the time that the order to show cause was served on them, they do not meet a threshold r equirement for suspension of deportation and therefor e are ineligible to be considered for this discretionary r elief.

Six other circuits have addressed the applicability of the stop-time rule to pending deportation proceedings, and each has held that the stop-time rule applies to all pending cases in which a final administrative decision had not been rendered by the enactment of the Refor m and Responsibility Act. See Afolayan v. INS, 219 F.3d 784, 788 (8th Cir. 2000); Gonzalez-Torr es v. INS, 213 F.3d 899, 903 (5th Cir. 2000); Rivera-Jimenez v. INS , 214 F.3d 1213, 1217 (10th Cir. 2000); Appiah v. INS, 202 F.3d 704, 708-09 (4th Cir. 2000); Tefel v. Reno, 180 F.3d 1286, 1288-90 (11th Cir. 1999), cert. denied 120 S.Ct. 2657 (2000); Arrozal v. INS, 159 F.3d 429, 434-35 (9th Cir. 1998). The decision of the Board constitutes the final administrative decision.

7

Therefore, as a matter of statutory law, the Board properly applied the new stop-time rule to the Pinhos' applications.

The Board's application of the stop-time rule to the Pinhos' case does not constitute an unconstitutional retroactive application of law. "A statute does not operate `retrospectively' merely because it . . . upsets expectations based in prior law." Landgraf, 511 U.S. at 269. "When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." Id. at 273.

Suspension of deportation is prospective r elief because it does not impair any vested rights. See T efel, 180 F.3d at 1302. Since the relief had not yet been granted and was discretionary even if the alien met all eligibility criteria, the change in eligibility criteria did not overtur n a final administrative decision or impair vested rights. At most, the Pinhos merely had an expectation of receiving the relief requested, not a right to it. The Pinhos had no preexisting legal right to remain in the United States, as they had already been adjudged deportable. Since no vested rights were affected in this case, no potential violation of due process exists. See Gonzalez-Torres, 213 F.3d at 903; Tefel, 180 F.3d at 1302.

The Pinhos argue that the Board's decision deprives them of more than discretionary relief which has not yet been granted because it deprives them of "their home, their family unit, their business and community support and the ties which they have established over the past fifteen years." The adjudication of their deportability established that they had no legal right to remain in this country. It was that determination, not the failur e to grant discretionary relief afterward, that cut off their rights to remain in the United States. Since the Pinhos conceded deportability, their status as deportable aliens is not before this Court.

The United States did not officially or systematically encourage the Pinhos to remain in this country or to pursue suspension of deportation in lieu of another means of acquiring lawful residency in the United States. On the contrary, the Pinhos overstayed their non-immigrant visas,

8

chose to establish residency, and started a business in this country without obtaining authorization to be in the United States. They also returned to the United States without valid authorization after having been refused immigrant visas. If the Government had induced the Pinhos to waive their rights to contest deportability or had singled out their application for delayed review until after the stop-time rule went into effect, then a different analysis might be appropriate.5 There is no evidence that anything out of the ordinary occurred in this case. The Pinhos are deportable because they entered the United States illegally. At the time their application for the discretionary r elief of suspension of deportation was reviewed by the Board, they did not qualify for any special exception from the generally applicable immigration laws.

The due process considerations of "fair notice, reasonable reliance, and settled expectations" ar e not implicated in this case. See Landgraf, 511 U.S. at 270. The Pinhos were not deprived of the opportunity to conform their conduct to the law. See id. at 265. The eligibility criteria for suspension of deportation review the circumstances in which an alien facing deportation is found, not any action taken by him. The Pinhos could not have undertaken any lawful action that would have changed their circumstances, allowing them to satisfy the continuous physical presence test.

The application of the stop-time rule to pending cases is constitutional if it has a rational basis. See Appiah, 202 F.3d at 710. We conclude that it does. Congress enacted this rule for the purpose of expediting the r emoval of deportable aliens, limiting discretionary r elief, and removing incentive to delay immigration proceedings. Gonzalez-Torres, 213 F.3d at 902; Appiah, 202 F.3d at 710. This was

_____

5. Circumstances such as these led to the exceptions for certain groups of aliens set out in NACARA. See also section II. B. of this opinion, infra.
While we are troubled by the significant delay in the Board's action on the Pinhos' appeal, we cannot conclude that it amounts to inducement by the Government for the Pinhos to remain in this country or to forego any alternative course of action. We can only speculate as to whether a different result may have been achieved if the Board acted promptly and decided this case prior to the enactment of the Reform and Responsibility Act.

done as an integral part of an overall streamlining of the immigration process in order to impr ove efficiency in that process. See Gonzalez-Torres , 213 F.3d at 902.

B.

The Pinhos also challenge NACARA's system for pr oviding more lenient requirements for certain groups of aliens with respect to the continuous physical presence rules. Aliens from Nicaragua, Cuba, and certain other Central American and eastern European countries ar e not subject to the stop-time rule under the transitional rules. See NACARA SS 202(b)(1), 203(a)(1); 8 U.S.C. S 1101 note (Supp. IV 1998).

It is well settled that the power to regulate the admission or removal of aliens is a "fundamental sover eign attribute exercised by the Government's political departments largely immune from judicial control." Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Shaughnessy v. Mezei, 345 U.S. 206, 210 (1953)). Congress's differing tr eatment of certain classes of aliens is an aspect of that political power and involves the United States' relations with for eign powers. Mathews v. Diaz, 426 U.S. 67, 81 (1976). Accor dingly, we must afford such legislation great deference, applying a "narrow standard of review" and upholding the law if it has a rational basis. Id. at 82.

NACARA's exceptions from the general stop-time rule for certain alien groups easily withstand this rational basis review. Since the application of the stop-time rule to pending cases itself does not violate due pr ocess, any exceptions to this rule that are carved out by Congress would be invalid only if the challenger "advanc[es] principled reasoning that will at once invalidate that [classification] and yet tolerate a dif ferent [classification] separating some aliens from others." 426 U.S. at 82.

The United States specifically encouraged aliens who are members of the groups described in NACARA to seek asylum and to remain in the United States. These aliens were given work authorization, granted various special statuses to avoid deportation until their cases could be fully reviewed, and specifically encouraged to apply for

10

suspension of deportation, as that remedy existed. See 143 Cong. Rec. S10,185, at 10197 (daily ed. Sept. 30, 1997) (statement of Sen. Mack). The special exemptions fr om "the 1996 retroactive immigration bill" for members of these "extremely identifiable groups," 143 Cong. Rec. S10185, at S10197 (daily ed. Sept. 30, 1997) (statement of Sen. Graham), bears at least a rational relationship to the legitimate government interests of for eign relations, national security policy, and compliance with on-going government programs.

The Pinhos are treated differ ently from groups of aliens who are granted special exceptions from the general immigration rules because they are not similarly situated to members of those groups. NACARA's exceptions ar e not arbitrary, but rather respond to particular government action directed specifically toward members of the groups who are granted the exceptions. Pursuant to its power to control immigration and respond to for eign relations and defense policy objectives, Congress passed the Reform and Responsibility Act, among other things, to limit discretionary relief from the generally applicable immigration laws. It further amended the immigration laws to provide for an exception for a readily identifiable, limited group of aliens who were subjects of on-going judicial and other government proceedings, including informal immigration proceedings. The exception was cr eated to prevent interference with settled expectations arising out of those proceedings. Therefore, we conclude that Congress acted well within its authority in enacting NACARA.

Accordingly, we affirm the decision of the Board of Immigration Appeals.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

11