Clinton **SHARPE**, Plaintiff,

v.

William **RILEY, et al.**, Defendants.

No. CIV.A. 03–3052.

United States District Court, E.D. Pennsylvania.

July 3, 2003.

Steven A. Morley, Morley Surin & Griffin, Philadelphia, PA, for Clinton Sharpe, Petitioner.

Stephen J. Britt, U.S. Attorney's Office, Philadelphia, PA, for William Riley, Interim Director of the Philadelphia Office of the Bureau of Immigration Customs and Enforcement (BICE) of the Department of Homeland Security, Theodore Nordmark, Assistant District Director for Deportation and Detention of BICE in Philadelphia, Department of Homeland Security, Respondents.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Petitioner Clinton Sharpe, Jamaican national facing deportation in connection with his 1991 convictions for unlawful restraint and criminal contempt, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. The issues before the court are (1) whether unlawful restraint and criminal contempt are crimes involving moral turpitude, (2) whether applying retroactively the "stop time" rule contained in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) in Sharpe's case is unconstitutional, and (3) whether, consistent with IIRIRA's stop

time rule, the period during which an alien may establish good moral character for purposes of qualifying for discretionary relief from deportation may "restart" after the issuance of an order to show cause or a conviction. For the reasons that follow, the petition will be denied.

## I. FACTS

Clinton Sharpe is a native and national of Jamaica who came to the United States as a non-immigrant temporary agricultural worker in 1986. He remained in the country past his scheduled departure date of March 18, 1987, and married a United States citizen in 1989.

On January 8, 1991, Sharpe was convicted of unlawful restraint and criminal contempt under Pennsylvania law after a negotiated guilty plea. The factual basis for the convictions was Sharpe's violation of a protection from abuse order and sexual assault of his spouse. He received concurrent indeterminate sentences for time served.

On May 12, 1995, the INS commenced deportation proceedings against Sharpe by Order to Show Cause, and Sharpe's deportation hearing took place on January 16, 1998. Taking into account Sharpe's convictions, the Immigration Judge found that unlawful restraint was a "crime involving moral turpitude." He also determined that, because the crime had occurred more than seven years prior to the deportation hearing, Sharpe was entitled to seek relief from deportation under the now repealed Immigration and Nationality Act, 8 U.S.C. § 1254 (repealed 1996), which at that time provided that an individual who had been of good moral character for the seven years preceding his deportation hearing was entitled to a suspension of the deportation if he could demonstrate extreme hardship to himself, to a citizen, or to a permanent resident child, parent or spouse. In the final analysis, however, the Immigration Judge found that Sharpe had not demonstrated the requisite extreme hardship, and therefore was subject to deportation. Sharpe appealed.

On October 7, 2002, the Board of Immigration Affairs (BIA) affirmed the Immigration Judge's decision to deport Sharpe, but on different grounds. As a threshold matter, the BIA agreed that unlawful restraint was a crime of moral turpitude. The BIA reasoned, however, that, in the wake of the 1996 enactment of the Illegal Immigrant Reform and Immigrant Responsibility Act (IIRIRA), Sharpe was not eligible for a suspension of deportation at all. This was so because of the operation of IIRIRA's so-called "stop time" rule, which provides that the time within which an alien may establish the good moral character for suspension of deportation ends at the time of the commission of the criminal acts themselves or at the time when deportation proceedings are commenced, rather than at the time of the deportation hearing. Therefore, the BIA found Sharpe to be deportable. Sharpe now seeks habeas review in this court.

## II. DISCUSSION

### A. Statutory Background

"Any alien who (I) is convicted of a crime involving moral turpitude committed within five years ... after date of admission, and (II) is convicted of a crime for which a sentence of one year or longer may be imposed is deportable." 8 U.S.C. § 1227(a)(2)(A)(i)(I). Under the Immigration and Nationality Act, the law in place before the 1996 enactment of the Illegal Immigrant Reform and Immigrant Responsibility Act, the Attorney General was empowered, in his discretion, to suspend such deportations, in situations where the alien had "been physically present in the United States for a continuous period of not less than seven years immediately pre-

ceding the date of [his] application," and had been "a person of good moral character" throughout the entire seven year period, and when, in the opinion of the Attorney General, the alien's deportation would "result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1254(a) (1994) (repealed by the Illegal Immigration Reform and Immigrant Responsibility Act, Pub.L. No. 104–208, § 309, 110 Stat. 3009–615 (1996)). Thus, under the Immigration and Nationality Act, "[a]liens accrued time toward the 'continuous presence in the United States' requirement until they applied for suspension of deportation. In short, the commencement of deportation proceedings had no effect on this accrual." *Ram v. INS*, 243 F.3d 510, 513 (9th Cir. 2001).

In 1996, the Immigration and Nationality Act was repealed and replaced by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009, 3009–627 (1996). The IIRIRA allows the Attorney General to cancel the removal of a deportable alien who:

(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;

(B) has been a person of good moral character during such period;

(C) has not been convicted of an offense under section ... [8 U.S.C.] 1227(a)(2) [including crimes involving moral turpitude] ...; and

(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United

States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1229b.

Although the criteria for "cancellation" of deportation under the IIRIRA does not differ radically from the criteria for "suspension" of deportation under the Immigration and Nationality Act, the IIRIRA substantially altered the manner in which an alien's "continuous physical presence" within the United States was to be counted. The change was born of Congress' belief that "[s]uspension of deportation [was] often abused by aliens seeking to delay proceedings until 7 years have accrued ... even after they [had] been placed in deportation proceedings." *Ram*, 243 F.3d at 513 (quoting H.R.Rep. No. 104–469(I), at 390 (1996), *available in* 1996 WL 168955). Therefore, the IIRIRA contained a "stop time" rule, which provided that

[A]ny period of continuous residence or continuous physical presence in the United States shall be deemed to end (A) ... when the alien is served a notice to appear ... or (B) when the alien has committed an offense ... [involving moral turpitude] ..., whichever is earliest.

8 U.S.C. § 1229b(d)(1).

By its own terms, the IIRIRA applied to removal cases commenced after April 1, 1997. In 1997, Congress enacted the Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Pub.L. No. 105–100, tit. II, 111 Stat. 2193 (1997), and provided that IIRIRA's stop time rule was to govern even in proceedings that had been commenced by orders to show cause before the IIRIRA's enactment. *Pinho v. INS*, 249 F.3d 183, 188 (3d Cir. 2001).

**B. Unlawful Restraint Is a Crime Involving Moral Turpitude.**

■ As a threshold matter, Sharpe argues that he is not subject to deportation at all, on the theory that unlawful restraint is not a crime involving moral turpitude. In particular, Sharpe argues that, because unlawful restraint under Pennsylvania law is a general intent crime, rather than a specific intent crime, a conviction for unlawful restraint in Pennsylvania does not require the vicious and corrupt mental state that characterizes a crime involving moral turpitude. For the reasons that follow, the court does not agree.

■ "Whether an alien's crime is one involving moral turpitude is determined by the statute and record of conviction rather than the alien's specific act." *DeLeon–Reynoso v. Ashcroft,* 293 F.3d 633, 635 (3d Cir.2002). Neither the Immigration and Nationality Act nor the IIRIRA defines what it meant by a "crime involving moral turpitude," and the Third Circuit has observed that "[t]he term 'moral turpitude' defies a precise definition." *Id.* at 635–36. However, the Third Circuit has cited with approval both Black's Law Dictionary's definition of the term as "[c]onduct that is contrary to justice, honesty, or morality" and an Opinion of the Attorney General, 37 Op. Att'y Gen. 293, 294 (1933) for the proposition that "[a] good and comprehensive statement concerning 'moral turpitude' [is] . . . anything done contrary to justice, honesty, principle or good morals." *Id.* at 636.

■ A survey of BIA opinions reveals similar definitions of the term "moral turpitude." *See, e.g., In re Tran,* 21 I. & N. Dec. 291, 293, 1996 WL 170083 (BIA 1996) ("Moral turpitude is a nebulous concept, which refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, contrary to the rules of morality and the duties owed between man and man, either one's

fellow man or society in general."); *Matter of Danesh,* 19 I. & N. Dec. 669, 670 (BIA 1988). The Board of Immigration Appeals has stated that "[t]he test to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind. Where knowing or intentional conduct is an element of a morally reprehensible offense, we have found moral turpitude to be present." *In re Tran,* 21 I. & N. Dec. at 293. Therefore, whether the crime at issue is a general, as opposed to a specific, intent crime is not dispositive of the question of whether an offense at issue constitutes a crime involving moral turpitude. *Cf. United States v. Kiang,* 175 F.Supp.2d 942, 951 (E.D.Mich. 2001) ("Further, and directly contrary to Defendant's assertions [that a general intent crime did not constitute a crime of moral turpitude], . . . specific intent is not a prerequisite to a finding that a crime involves moral turpitude.").

Pennsylvania law states that an individual commits the crime of unlawful restraint if he "knowingly (1) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury; or (2) holds another in a condition of involuntary servitude." 18 Pa. Cons.Stat. Ann. § 2902. There is no case law stating whether unlawful restraint under Pennsylvania law constitutes a crime involving moral turpitude for purposes of the immigration statutes. Examining the statute itself, however, the court is satisfied that both statutory categories of unlawful restraint proscribe conduct contrary to justice, honesty, and morality. Moreover, the court is persuaded that, regardless of whether unlawful restraint constitutes a general intent crime, committing such acts with knowledge is tantamount to committing them with the vicious and corrupt mindset that characterizes crimes of moral turpitude. Therefore,

the court finds that Sharpe has been convicted of a crime of moral turpitude for purposes of the immigration laws, and was properly subject to deportation as a result.[1]

### C. IIRIRA's Stop Time Rule Prohibits Sharpe from Obtaining Relief from Deportation.

#### 1. IIRIRA's stop time rule is not impermissibly retroactive.

■ Given that unlawful restraint is a crime involving moral turpitude for purposes of the immigration statutes, Sharpe next contests his deportation through an attack on the constitutionality of retroactively applying IIRIRA's stop time rule to Sharpe and others whose deportation proceedings had already commenced by the time of the IIRIRA's enactment. In particular, Sharpe questions whether the Third Circuit's most recent pronouncement on the constitutionality of the retroactive application of IIRIRA in *Pinho v. INS*, 249 F.3d 183 (2001) has continued vitality in light of the Supreme Court's seminal decision in *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), which altered the applicable inquiry six months after *Pinho* was decided. For the reasons that follow, the court concludes that the retroactive application of IIRIRA's stop time rule to immigration proceedings already commenced at the time of IIRIRA's enactment is constitu-tional under the principles established in *St. Cyr*.

The respondent in *St. Cyr* was an alien who plead guilty to a charge of selling a controlled substance in violation of state law before the 1996 enactments of the Antiterrorism and Effective Death Penalty Act (AEDPA) and the IIRIRA. *Id.* at 293, 121 S.Ct. 2271. Although St. Cyr's conviction rendered him deportable, under the pre-AEDPA law in place at the time of his guilty plea, he would have been eligible for a waiver of deportation at the discretion of the Attorney General. *Id.* Removal proceedings were not commenced against St. Cyr until 1997, at which point both the new AEDPA and IIRIRA, which stripped away the Attorney General's previously existing discretion to grant a waiver of deportation, were fully effective. *Id.* Facing imminent deportation for an offense that under the old laws was subject to discretionary waiver, St. Cyr argued that the restrictions on discretionary relief contained in the 1996 statutes could not constitutionally apply to removal proceedings brought against an alien who pleaded guilty to a deportable crime before their enactment. *Id.* The Supreme Court ultimately agreed. *Id.* at 326, 121 S.Ct. 2271.

According to the Court, "the first step in determining whether a statute has an impermissible retroactive effect is to ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively." *Id.* at 316, 121 S.Ct.

---

1. The court notes that Sharpe contended in one line of his brief that criminal contempt, lacking a specific intent to harm, is also a crime devoid of moral turpitude. This is an argument that ultimately received little attention from the parties in their briefs or at oral argument, because it was conceded that Sharpe would be subject to deportation on a finding that his unlawful restraint conviction constituted a conviction for a crime involving moral turpitude. Indeed, it is impossible to determine from the record, which states that the charges against Sharpe were "04300–criminal contempt-arising out of protection from abuse order-domestic violence–101.90," the exact statute under which Sharpe was convicted. In light of these facts, and given the court's finding that unlawful restraint constitutes a crime involving moral turpitude for purposes of the immigration laws, and is therefore a sufficient basis for Sharpe's deportation, the court will not rule on Sharpe's apparently abandoned alternative argument regarding his criminal contempt conviction.

2271. Describing the standard for finding such unambiguous direction as a "demanding one," *id.*, the Court noted that "cases where this Court has found truly 'retroactive effect' adequately authorized by statute have involved statutory language that was so clear that it could sustain only one interpretation." *Id.* at 316–17, 121 S.Ct. 2271 (quoting *Lindh v. Murphy,* 521 U.S. 320, 328 n. 4, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). Examining several aspects of the portion of the IIRIRA relevant in *St. Cyr,* the Court found only ambiguous indications as to whether Congress intended retroactive application, and concluded that it had not, based on "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien." *Id.* at 320, 121 S.Ct. 2271 (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

In a context where Congress had not clearly intended retroactive application, the second step of the Supreme Court's inquiry was whether the statute "produce[d] an impermissible retroactive effect." *Id.* at 320, 121 S.Ct. 2271. The Court explained:

> The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment. A statute has retroactive effect when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.

*Id.* at 321, 121 S.Ct. 2271. Therefore, "the judgment whether a particular statute acts retroactively should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* With this and the first prong

as guides, the Supreme Court found that the relevant portion of the IIRIRA was impermissibly retroactive in St. Cyr's case. *See id.* at 326, 121 S.Ct. 2271.

This was so, the Court reasoned, because plea agreements of the type entered into by St. Cyr, represent a quid pro quo agreement whereby criminal defendants "waive several of their constitutional rights (including the right to a trial) and grant the government numerous tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources." *Id.* at 322, 121 S.Ct. 2271. Noting that, for an alien defendant, the immigration consequences of a conviction inherently enter the calculus of any decision to enter into a plea agreement, rather than to fight the charge at trial, *id.*, the Court worried that alien defendants in St. Cyr's position had relied on the pre-AEDPA law when determining whether to plead guilty to an offense that would render them deportable. *Id.* at 323, 121 S.Ct. 2271. Mindful that prosecutors had benefitted from plea agreements facilitated aliens' belief in their continued eligibility for discretionary relief from deportation, the Court concluded that "it would surely be contrary to familiar considerations of fair notice, reasonable reliance, and settled expectations, to hold that IIRIRA's subsequent restrictions deprive them of any possibility of such relief." *Id.* at 323–24, 121 S.Ct. 2271.

*St. Cyr* is readily distinguishable from the situation presented in the instant case. First, Congress' intent that IIRIRA's stop time rule be retroactively applied to proceedings commenced before IIRIRA's enactment is unambiguously expressed in the NACARA, a subsequent legislative enactment. As the Third Circuit explained in *Pinho,* in the wake of the enactment of the IIRIRA, "[u]ncertainty existed in the interpretation of [the IIRIRA] ... because

it stated that the new stop-time rule applied to 'notices to appear issued before, on, or after' enactment of [IIRIRA]." *Pinho*, 249 F.3d at 187. The fact that the IIRIRA referred only to "notices to appear" raised questions about the statute's intended effect on deportation proceedings commenced before its enactment, because deportation proceedings commenced under the Immigration and Nationality Act were initiated through "orders to show cause," rather than through a "notice to appear." *Id.* Section 203(a)(1) of the NACARA, which by its terms provides "Transitional Rules With Regard to Suspension of Deportation," specifically obviated this confusion. The NACARA stated that the IIRIRA's new stop time rule "shall apply to orders to show cause ... issued before, on, or after the date of the enactment of this Act." NACARA, Pub.L. No. 105–100, tit. II, 111 Stat. 2193 (1997), amended by Pub.L. No. 105–139, 111 Stat. 2644 (1997). Thus, the NACARA unambiguously extends the reach of IIRIRA's stop time rule to deportation proceedings commenced before and pending at the time of the IIRIRA's enactment.

Second, it cannot be said that in Sharpe's case the application of IIRIRA's stop time rule has taken away or impaired vested rights acquired under existing laws or attached a new disability to transactions or considerations already past in a way that runs afoul of traditional considerations of fair notice, reasonable reliance, and settled expectations. Sharpe alleges that the change in the law deprived him of an expectation that he could accrue seven years of good moral character after his conviction. While this may be so, however, it can hardly be said that such an expectation constituted a vested right of constitutional dimension, given that under pre-IIRIRA law, an alien's ability to demonstrate seven years of good moral character after his conviction and so qualify for discretionary suspension of deportation

was entirely contingent on the fortuity that the alien's deportation hearing would be delayed for more than seven years after his conviction.

Moreover, unlike St. Cyr, Sharpe is able to demonstrate no detrimental change in legal position in reliance on the availability of possibly demonstrating good moral character post-conviction. In contrast to St. Cyr, who entered a guilty plea in reliance on the expectation that the offense to which he had admitted would not bar him from obtaining discretionary relief from deportation, there is no indication that Sharpe's negotiated guilty plea resulted from a belief that he could qualify for discretionary relief on the off chance that he might be able to prolong his deportation proceedings for seven years. Indeed, given the remoteness of that possibility, reliance would not, in any event, have been reasonable. Therefore, applying the principles of *St. Cyr*, the court concludes that retroactive application of the IIRIRA's stop time rule to proceedings commenced before the enactment of the IIRIRA is not impermissibly retroactive.

2. *Under the stop time rule, Sharpe was prohibited from accruing additional good moral character time after his conviction for unlawful restraint.*

In his final attempt to escape the consequences of applying the stop time rule in his case, Sharpe argues that "the stop time rule ... does not address whether a period of good moral character can begin again." Pet. for Writ of Habeas Corpus and Stay of Removal at ¶ 19. Therefore, Sharpe apparently urges that he should be allowed to accrue years of good moral character after he was convicted of unlawful restraint, or after he received the order to show cause that commenced deportation

proceedings against him. The court does not agree.

Although the Third Circuit has not spoken to the issue, other circuit courts have uniformly endorsed the holding of the BIA, sitting en banc in the case of *In re Mendoza–Sandino,* that "the clock cannot be reset so that an alien accrues continuous physical presence or continuous residence after the service of an Order to Show Cause or the commission of a specified crime." *In re Mendoza–Sandino,* 22 I. & N. Dec. 1236, 2000 WL 225840 (BIA Feb. 23, 2000); *see also Najjar v. Ashcroft,* 257 F.3d 1262, 1299–1300 (11th Cir.2001); *McBride v. INS,* 238 F.3d 371, 375–376 & n. 25 (5th Cir.2001); *Afolayan v. INS,* 219 F.3d 784, 788–89 (8th Cir.2000); *Erebara v. Elwood,* 2002 WL 31626708, at *4 (E.D.Pa. Nov.18, 2002) (Newcomer, J.) (all relying on *Mendoza–Sandino* ). The court finds this authority persuasive, and concludes, applying IIRIRA's stop time rule to Sharpe, that the time in which Sharpe was to establish good moral character ended on January 8, 1991, when he was convicted for commission of unlawful restraint, a crime involving moral turpitude.

## III. CONCLUSIONS

For the foregoing reasons, Sharpe's petition for writ of habeas corpus will be denied.

An appropriate order follows.

### ORDER

**AND NOW,** this 3rd day of July, 2003, it is hereby **ORDERED** that the petitioner's request for writ of habeas corpus under 28 U.S.C. § 2241 (doc. no. 1) is **DENIED.**

**AND IT IS SO ORDERED.**