Ernesto NODARSE, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant.

No. 02–22594–CIV.

United States District Court;
S.D. Florida.

March 23, 2004.

Lizel Gonzalez, Esq., Vivian Chavez, Esq., Legal Services of Greater Miami, Inc., Miami, FL, for plaintiff.

David Haimes, Assistant United States Attorney, Miami, FL, for defendant.

## ORDER AFFIRMING AND MODIFYING REPORT AND RECOMMENDATION AND FINAL JUDGMENT

HUCK, District Judge.

THIS CAUSE is before the Court upon the January 14, 2004 Report and Recommendation ("R & R") of Magistrate Robert L. Dubé. On January 24, 2004, Plaintiff filed his Objections to the R & R. On January 29, 2004, Defendant filed its Objections and Response to Plaintiff's Objections. On February 6, 2004, Plaintiff filed a Response to Defendant's Objections. Section 636(b)(1) of the Federal Magistrate Act requires this Court to make a *de novo* determination of those parts of the Magistrate Judge's R & R to which objection is made. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512–13 (11th Cir.1990). Upon *de novo* review, and for the reasons set out below, the Court affirms the R & R, grants Plaintiff's Motion for Summary Judgment, and denies Defendant's Motion for Summary Judgment.

### Factual Background and Procedural History

Ernesto Nodarse was born in Cuba on November 7, 1947, and entered the United States near El Paso, Texas, on October 1, 1988, without inspection. He filed for asylum shortly thereafter, but his application was denied, and he and his family were placed in deportation proceedings. Nodarse subsequently applied for an adjustment of status and was granted lawful permanent residency on January 24, 2001, under the status category NC–6, a category which specifically indicates adjustment to legal residency under the Nicaraguan and Central American Relief Act ("NACARA"). Nodarse filed an application for Supplemental Security Income ("SSI") benefits, his second such application, on February 8, 2001.

As recounted more fully in the R & R, Nodarse's application for SSI was originally denied. He then filed a request for rehearing by an Administrative Law Judge ("ALJ"), which was granted. On April 3, 2002, the ALJ found that Nodarse

was eligible for SSI as a Cuban/Haitian entrant as of January 24, 2001. Subsequently, the Acting Regional Commissioner of the Social Security Administration recommended that the Appeals Council review the decision of the ALJ on its own motion. The Appeals Council agreed to accept review and, then, on July 15, 2002, reversed the ALJ decision, finding that Nodarse's alien resident status does not currently make him eligible for benefits. Pursuant to 42 U.S.C. § 405(g), on September 3, 2002, Nodarse filed a Complaint in this Court seeking judicial review of the Appeals Council decision. Nodarse filed a Motion for Summary Judgment on April 1, 2003, and Defendant filed his response to that Motion and a cross-motion for summary judgment on June 12, 2003. The case was subsequently referred to Magistrate Judge Robert Dubé, who held a hearing on the summary judgment motions on December 11, 2003. On January 14, 2004, Judge Dubé issued his R & R, which recommended that Plaintiff's Motion for Summary Judgment be granted and that Defendant's Motion be denied, thereby reversing the decision of the Appeals Council. Having received objections from both parties, the R & R is now ripe for consideration by this Court.

### Analysis

The issues appealed from the Appeals Council are purely questions of law. Although a more restrictive standard of review applies if an appeal of a final decision of the Commissioner of Social Security is based on that decision's factual findings, no presumption of validity attaches to the Commissioner's conclusions of law. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir.1991) (holding the district court can reverse the Commissioner's decision based on her "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted"). Therefore, the Court must conduct its own analysis of the legal question involved in this matter.

The main question for resolution by the Court at this time is whether Plaintiff Ernesto Nodarse meets the alien resident status requirements necessary to be eligible for social security benefits under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). That question hinges on the interaction of the PRWORA and two other statutes that must be analyzed and construed to determine Nodarse's alien resident status and whether that status makes him eligible for any federal public benefits.

The PRWORA states that "an alien who is not a qualified alien (as defined in section 1641 of this title) is not eligible for any Federal public benefit." 8 U.S.C. § 1611(a). The definition of qualified alien includes "an alien who is a Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980)." *Id.* § 1641(b)(7). Even most qualified aliens are barred from receiving certain, specified federal benefits, including SSI. *Id.* § 1612(a). However, the Act allows several exceptions to this general rule, including allowing an alien who is "granted status as a Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980)" to collect SSI benefits for seven years after he or she has been granted such status. *Id.* § 1612(a)(2). The relevant portion of the Refugee Education Assistance Act ("REAA") defines Cuban/Haitian entrant as:

> (1) any individual granted parole status as a Cuban/Haitian Entrant (Status Pending) or granted any other special status subsequently established under the immigration laws for nationals of Cuba or Haiti, regardless of the status

of the individual at the time assistance or services are provided; and

(2) any other national of Cuba or Haiti—

    (A) who—

        (i) was paroled into the United States and has not acquired any other status under the Immigration and Nationality Act;

        (ii) is the subject of removal proceedings under the Immigration and Nationality Act; or

        (iii) has an application for asylum pending with the Immigration and Naturalization Service; and

    (B) with respect to whom a final, nonappealable, and legally enforceable order of removal has not been entered.

Pub.L. 104–208, § 501(e), 8 U.S.C. § 1522 note. Finally, section 202 of the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), enacted in 1997, after both the REAA and the PRWORA, permitted the status of an alien to be adjusted to "that of an alien lawfully admitted for permanent residence" by filing an application prior to April 1, 2000. Pub.L. 105–100, § 202(a)(1), 111 Stat. 2160, 8 U.S.C. 1255 note. In order to qualify for the adjustment in status, the alien had to be a "national of Nicaragua or Cuba ... who has been physically present in the United States for a continuous period, beginning not later than December 1, 1995" and who was otherwise eligible to receive an immigrant visa and otherwise admissible to the United States for permanent residence. *Id.* § 202(a)(1), (b)(1).

Before the Magistrate Judge, Nodarse argued that he qualifies under the PRWORA exception as a Cuban/Haitian entrant under § 501(e)(1) of the REAA definition. Nodarse also argues that he should be considered to have been lawfully residing in the United States as a Cuban/Haitian entrant on August 22, 1996, under § 501(e)(2) of the REAA definition

because, at the time of the passage of the PRWORA, he was a national of Cuba who was the subject of removal proceedings and against whom a final, nonappealable, and legally enforceable order of removal had not been entered. Defendant argued that Nodarse does not qualify under either of these definitions. In the R & R, the Magistrate Judge agreed with Nodarse that he did qualify as a Cuban/Haitian entrant under § 501(e)(1), but did not address Nodarse's alternative argument that he was a § 501(e)(2) Cuban/Haitian entrant on the ground that it had not been raised in the administrative proceedings. Nodarse objected to the Magistrate Judge's failure to address that alternative argument. Defendant objected to the Magistrate Judge's determination that Nodarse is a Cuban/Haitian entrant under § 501(e)(1), and further argued that Nodarse cannot be considered a Cuban/Haitian entrant under § 501(e)(2) because he was a lawful permanent resident at the time of his February 8, 2002 SSI application and, therefore, was not the subject of removal proceedings. The Magistrate Judge's recommendations and each of the objections shall be considered below.

## I. Adjustment to Permanent Legal Resident Status Under NACARA

        The purpose of statutory construction is to determine the intent of the legislature in enacting a statute. In determining congressional intent, courts should give overriding deference to the unambiguous language of a statute. *See, e.g., Napier v. Preslicka,* 314 F.3d 528, 532 (11th Cir.2002), *cert. denied,* 124 S.Ct 1038 (2004); *In re Paschen,* 296 F.3d 1203, 1207 (11th Cir.) ("When the language of a statute is unambiguous, we need go no further, because we must presume that Congress 'said what it meant and meant what it said.' ") (citation omitted), *cert. denied,* 537 U.S. 1097, 123 S.Ct. 696, 154 L.Ed.2d 648

(2002). A court may look at evidence of legislative intent other than the statutory language in only three circumstances:

> We may look to evidence of Congressional intent outside the four corners of the statute if "(1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent."

*Moore v. Am. Fed'n of Television & Radio Artists,* 216 F.3d 1236, 1244 (11th Cir.2000) (quoting *United States v. DBB, Inc.,* 180 F.3d 1277, 1281 (11th Cir.1999)).

█ This Court must decide whether Nodarse's adjustment to lawful permanent resident status under the NACARA constitutes a "special status subsequently established under the immigration laws for nationals of Cuba or Haiti" that would make Nodarse a Cuban/Haitian entrant under § 501(e)(1) of the REAA as of January 24, 2001. As noted, the PRWORA allows an exception to its prohibition on receipt of SSI benefits for seven years after an alien is granted status as a Cuban and Haitian entrant. 8 U.S.C. § 1612(a)(2)(A)(iv). The Magistrate Judge concluded that, by the plain language of the NACARA, which was enacted after the REAA, that act established "a special status ... under the immigration laws for nationals of Cuba." In its objections, Defendant argues, however, that the statutory language is not plain and clear, and that reference to extrinsic materials in order to determine if Nodarse was a Cuban/Haitian entrant is entirely appropriate. Defendant essentially argues that the status which Nodarse was adjusted to under the NACARA provision, lawful permanent residency, is neither "special," nor was it "subsequently established," because any foreign national, not just those from Cuba or Haiti, can be admitted as a lawful permanent resident if he or she meets certain requirements, and because lawful permanent residency is a

status that predates the NACARA. Defendant claims, then, that to the extent that the language is clear, Nodarse does not qualify since his status of lawful permanent residency was neither special nor subsequently established.

Defendant further argues, nonetheless, that the language of the statute is not clear and that the Court should look to extrinsic material, and particularly should defer to the Office of Refugee Resettlements' ("ORR") interpretation of the REAA in reaching this conclusion. In State Letter SL00–17, the ORR included a footnote which states:

> *Note. ORR is not interpreting the phrase, "any other special status subsequently established under the immigration laws for nationals of Cuba or Haiti" to refer to lawful permanent residence obtained under the Nicaraguan Adjustment and Central American Relief Act (NACARA) or the Haitian Refugee Immigration Fairness Act (HRIFA). Although NACARA and HRIFA offer a special opportunity for nationals of Cuba and Haiti, the status conferred by these laws, lawful permanent residence, is not a "special status." Thus, if the person did not qualify as a Cuban or Haitian entrant, adjustment of status, regardless of the legal basis for the adjustment, does not make the person a Cuban and Haitian entrant.

State Letter SL–00–17 (emphasis in original). The Appeals Council had also relied heavily on this statement in reversing the ALJ.

The Court sees some merit in Defendant's argument that the statute is not clear. Defendant appears to argue that the term "status" is a term of art that refers only to several, specific designations of alien status, including lawful permanent residency, regardless of the manner in which that residency is gained.

Nonetheless, the Court agrees with the Magistrate Judge that the statutory language is clear, and that the term "special status subsequently established under the immigration laws for nationals of Cuba or Haiti" is sufficiently broad to encompass adjustment to lawful permanent residency under special procedures established for Cuban nationals. The Court finds that the plain meaning of that entire phrase evinces an intent by Congress to predict any future special legislative immigration treatment of aliens from Cuba or Haiti and to ensure that such targeted legislation which recognizes the special circumstances which resulted in Haitian and Cuban refugees coming into the country continues to be accounted for in determining their entitlement to various federal benefits. As Plaintiff argues, even if there are other ways through which lawful permanent residency can be obtained and even if nationals other than those from Cuba or Haiti can become lawful permanent residents, the "special status" at issue here can properly be described as NACARA adjustment to lawful permanent residency. The NACARA clearly was special, targeted legislation, in that it only allowed certain nationals, including those from Cuba, to become lawful permanent residents merely based on the amount of time they had been in the United States, and only if they applied prior to April 1, 2000. While Congress would have made the Court's decision easier had it created a whole new term for this adjusted status, the Court finds that the NACARA, nonetheless, is exactly the type of special treatment of Cuban nationals envisioned by the phrase "special status subsequently established under the immigration laws for nationals of Cuba." Thus, Nodarse does qualify as a Cuban/Haitian entrant under § 501(e)(1) of the REAA.

Even had this Court not found the language to be clear and to encompass adjustment to lawful permanent residency under the NACARA, the Court would find that extrinsic evidence further supports this result. Several courts have specifically noted that Congress intended to afford special treatment to refugees from Cuba and other Central American countries through various pieces of legislation, including the NACARA. See, e.g., Pinho v. INS, 249 F.3d 183, 190 (3rd Cir.2001) (noting that "[t]he United States specifically encouraged aliens who are members of the groups described in NACARA to seek asylum and to remain in the United States"); Rodriguez–Silva v. INS, 242 F.3d 243, 247 (5th Cir.2001) ("Because of foreign policy considerations, the United States has encouraged Nicaraguans and Cubans to remain in this country."); Ram v. INS, 243 F.3d 510, 517 (9th Cir.2001) (noting that, through the NACARA, Congress intended to favor aliens who had either "taken unusual risks in escaping from oppressive governments" or "whose countries had been profoundly ravaged by war," and that such a decision "stems from a rational diplomatic decision to encourage such aliens to remain in the United States").

In addition, one court has found that the NACARA was enacted partly to "correct a provision in [a 1996 Act] that would have the effect of 'changing the rules in the middle of the game for thousands of Central Americans and others who came to the United States because their lives and families had been torn apart by war and oppression.'" Appiah v. INS, 202 F.3d 704, 710 (4th Cir.2000) (quoting statement of Sen. Abraham, 143 Cong. Rec. S12,261 (daily ed. Nov. 9, 1997)). That court held that "there was concern that the United States should not violate earlier understandings with these particular groups of aliens. Congress thus drew the line at certain nationalities. We refuse to rework this legislative compromise."

*Id.*[1] In *Pinho,* the court specifically noted that the PRWORA was enacted "to limit discretionary relief from the generally applicable immigration laws," but that an exception was made "for a readily identifiable group of aliens who were subjects of on-going judicial and other government proceedings, including informal immigration proceedings," in order to "prevent interference with settled expectations arising out of those proceedings." 249 F.3d at 190–91. The Eleventh Circuit has also examined Congress's possible intent in exempting five statutorily designated classes of aliens, including Cuban/Haitian entrants, from the PRWORA bar on federal public benefits, stating that Congress may have extended benefits to these groups who "are seeking refuge in the United States because of especially trying political, social, or economic circumstances in their native countries" for the "humanitarian purpose of aiding aliens fleeing such difficult conditions." *Rodriguez v. United States,* 169 F.3d 1342, 1351 (11th Cir.1999). These cases, which refer to legislative histories and statements of lawmakers, support that, as part of its policy of encouraging Cubans to remain in the United States, Congress intended for NACARA to exempt individuals who adjust to lawful permanent residency under its provisions from the PRWORA bar to certain public benefits.

Finally, as noted, Nodarse's immigration code, NC–6, specifically designates an alien as a lawful permanent resident due to NACARA adjustment. Different immigration codes are given to that the United States Citizenship and Immigration Services ("USCIS") understands the special nature of NACARA adjustment to lawful permanent residency.

■ In arguing that the extrinsic evidence supports the opposite conclusion, Defendant primarily argues that the Court must defer, under *Chevron, U.S.A. v. Natural Resources Defense Council,* to the ORR's interpretation because it is a reasonable and permissible construction of the statute. 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court disagrees. In recent years, the Supreme Court has clarified that deference to the degree required by *Chevron* is only warranted where the statutory interpretation is recorded in a regulation that was subject to notice-and-comment rulemaking or was promulgated in a manner similar to formal rulemaking. *See United States v. Mead Corp.,* 533 U.S. 218, 230–231, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *see also Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."). The ORR's State Letter SL–007 is not a regulation that was subject to notice-and-comment or other procedures similar to formal rulemaking.[2] Thus, the Court is not required to defer to the ORR interpretation,

---

1. Although this statement was related to different act, it supports that Congress also intended to prevent the PRWORA from "changing the rules in the middle of the game."

2. Although the Court noted in *Mead* that it "had sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded," 533 U.S. at 231, 121 S.Ct. 2164, this is not one of those exceptional circumstances in which deference is necessary despite the lack of formal rulemaking. As Nodarse argues, this State Letter has a limited purpose, is not binding on state agencies, and was promulgated under a different act by an agency other than the Social Security Administration. These arguments only further support that this is not the type of agency interpretation that is entitled to *Chevron* deference.

but rather may simply evaluate its persuasiveness, as the Court would when looking at case law from a different circuit. *See Christensen,* 529 U.S. at 587, 120 S.Ct. 1655 ("[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' ... but only to the extent that those interpretations have the 'power to persuade ....'") (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). In that light, the Court agrees with the Magistrate Judge that the ORR's interpretation is a bit strained and, therefore, unpersuasive. In trying to determine the congressional intent, the ORR narrowly focuses on the term "status" in the REAA definition of Cuban/Haitian entrant, without reading the whole phrase "special status subsequently established under the immigration laws for nationals of Cuba." In fact, the ORR's recognition that the NACARA provides a "special opportunity for nationals of Cuba" only bolsters the Court's finding that the NACARA is the type of subsequent legislation Congress had in mind when defining Cuban/Haitian entrant.[3]

**3.** Defendant also argues that the legislative history of the REAA, which was enacted in 1980, supports the conclusion that the REAA only intended to grant immediate federal benefits to establish short-term, emergency assistance to help Cuban refugees in resettlement and education of their children. However, the act primarily being construed here is the PRWORA, which merely borrows the definition of Cuban/Haitian entrant from the REAA; had Congress, instead, rewritten that definition in the text of the PRWORA, there would be no grounds for even looking at the REAA or any agency interpretations under that act. Further, even if Congress did intend to provide only emergency relief under the REAA, the PRWORA, an act passed sixteen years after the REAA, clearly relates to more long-term public benefit programs, denying them to aliens except for those who meet a short list of exceptions, one of which is Cuban/Haitian entrants. It specifically notes that Cuban/Haitian entrants are entitled to SSI bene-

## II. Status as a Cuban/Haitian Entrant on August 22, 1996

Nodarse next argues that he is also eligible for SSI because he was a Cuban/Haitian entrant as of August 22, 1996, according to the definition in § 501(e)(2) of the REAA, and because he is currently disabled. The Magistrate Judge stated that he would not address that argument because it had not been raised or addressed by either the ALJ or the Appeals Council. Plaintiff objected, arguing that the issue had been raised and that, in any event, in *Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000), the Supreme Court held that judicial review of arguments are not waived even if they are not raised at the administrative level before the Social Security Appeals Council. *See also Loudermilk v. Barnhart,* 290 F.3d 1265, 1268 n. 1 (11th Cir.2002). In its response to those objections, Defendant concedes that there is no requirement of issue exhaustion in Social Security appeals before the Appeals Council, but notes that the Court, in *Sims,* did not decide whether issues not raised before the ALJ were waived.[4] Nodarse argues that this alter-

fits for seven years after entry and allows Cuban/Haitian entrants who entered after August 22, 1996, to obtain "means tested public benefits" after a five-year waiting period. Clearly, these provisions envision more than short-term relief for Cuban/Haitian entrants, thereby negating any inference from the REAA's legislative history that Congress still intended to provide only emergency public benefits for Cuban/Haitian entrants when it exempted them from certain provisions of the PRWORA.

**4.** Defendant notes that the Supreme Court did not address the question of whether issue exhaustion was required in proceedings before the ALJ, but then neither cites any case law to suggest that issue exhaustion is required before that trier of fact nor claims that the issue was not raised before the ALJ. Nodarse, on the other hand, has pointed out statements in the ALJ's order that suggest the issue was raised. Thus, the Court finds that it

native ground for finding that he is eligible for SSI should be considered because it will entitle him to indefinite benefits, whereas a finding that he is merely a Cuban/Haitian entrant as of January 24, 2001, pursuant to NACARA adjustment to lawful permanent resident status, will limit him to seven years of SSI benefits.

■ The Court concludes that Nodarse, as of the time he filed this application for SSI benefits, could not be considered a Cuban/Haitian entrant under § 501(e)(2). As noted, Nodarse adjusted to lawful permanent resident status on January 24, 2001. The present application for SSI benefits was filed on February 8, 2001. According to the statute, the bar on receiving SSI "shall not apply to an alien who is ... lawfully residing in the United States on August 22, 1996," and who is "blind or disabled, as defined in section 1382(a)(2) or 1382(a)(3) of Title 42." Under § 501(e)(2)(ii) of the REAA, an alien can be considered a Cuban/Haitian entrant if the individual is a national of Haiti or Cuba and "is the subject of removal proceedings." Pub.L. 104–208, § 501(e), 8 U.S.C. § 1522 note. Both parties agree that the applicant must be the "subject of removal proceedings" at the time of his SSI application in order to qualify as a Cuban/Haitian entrant under this defini-

tion. It is undisputed that at the time of his second, February 8, 2001 SSI application, Nodarse was a legal permanent resident and was not subject to removal proceedings. Therefore, he cannot qualify under § 501(e)(2) as a Cuban/Haitian entrant at the time of his second SSI application.

Nodarse, however, argues that the relevant date from which his status should be measured under § 501(e)(2) is March 29, 1999, the date he filed his first application for SSI. Without getting into his substantive arguments, the Court notes that Nodarse has failed to show that this Court has jurisdiction to entertain such arguments.[5] Nodarse's request that this date be used for determining his status on August 22, 1996, appears to be a disguised attempt to have this Court review the denial of Nodarse's March 29, 1999 application by the Social Security Administration, which found that he was not a Cuban/Haitian entrant at that time or on August 22, 1996, because he had not been subject to deportation proceedings during that period.

In order for this Court to hear an appeal of a final decision of the Commissioner of Social Security, an action must be brought in district court "within sixty days after the mailing of notice of [a final] decision or

is not barred from considering Nodarse's alternative argument on the ground that the issue was not properly raised in the administrative proceeding.

5. The Court does note, however, that Nodarse's argument that he was a Cuban/Haitian entrant as of August 22, 1996, requires a finding that he was "lawfully residing" in the United States as of that date. However, he also argues, as he must to qualify as a Cuban/Haitian entrant under § 501(e)(2)(ii), that he was in deportation proceedings at that time. While Congress created the category of Cuban/Haitian entrant in order to permit these refugees to avoid immediate deportation and to entitle them to certain public benefits,

it is difficult to imagine that Congress would intend to classify anyone still subject to removal as "lawfully residing" in the country, especially since entry of a final order of removal during those proceedings would confirm that the refugee was *not* legally residing in the United States. Therefore, it is unlikely, even if the Court did find Nodarse to be a § 501(e)(2) Cuban/Haitian entrant on August 22, 1996, that he would be eligible for indefinite SSI benefits under the grandfather clause since he still would not have been "lawfully residing" in the country. However, the Court declines to rule on this issue since the question is not properly before it for the reasons stated below.

within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g); *see also Bowen v. City of New York,* 476 U.S. 467, 478–479, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) (holding that, although the requirement of filing a complaint within sixty days is a period of limitations and not jurisdictional, it must be strictly construed as it is a condition on which the United States agreed to waive its sovereign immunity); *Thompson v. Schweiker,* 665 F.2d 936, 940 (9th Cir.1982) (holding that, if a complaint is filed more than 60 days after a final decision, "a dissatisfied claimant may petition the Secretary for relief; however, the Secretary's decision whether to reopen those claims is discretionary and not subject to review.") (citing *Califano v. Sanders,* 430 U.S. 99, 108, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)).

▪ Although the record contains little documentation of Nodarse's March 29, 1999 SSI application, the ALJ opinion on

Nodarses' February 8, 2001 application notes that that first application was denied on the basis that he was not eligible due to his alien status. It is not clear whether Nodarse requested an administrative appeal of that first SSI rejection from the Appeals Council.[6] Further, the ALJ considered whether his March 29, 1999 application should be reopened in light of his ruling on the February 8, 2001 application, and explicitly stated that he found that no good cause existed to do so.[7] Nonetheless, Nodarses' argument here appears to be simply another request for reopening and reconsideration of that first denial of eligibility and a determination that he should have been found to be a Cuban/Haitian when he first applied for SSI on March 29, 1999. Because this action was filed more than sixty days after the denial of the first application and because the matter was not reopened by the Commissioner of Social Security when he filed his second application, this Court may not review that initial denial of status as a Cuban/Haitian entrant.[8] For these reasons, the Court finds

---

6. If he did not, that fact, alone, would likely deprive this Court of jurisdiction because a social security claimant must exhaust administrative remedies before filing an action in district court. Thus, unless exceptional circumstances are found, there is no "final decision" to be reviewed if a claimant fails to request a review from the Social Security Appeals Council. *See Sims v. Apfel,* 530 U.S. 103, 106, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000).

7. At oral argument, Nodarse argued that case law supports that a subsequent SSI application is a *de facto* request to reopen the denial of a prior application. However, here, the ALJ clearly did consider reopening the prior application and refused to do so. "[S]ubject matter jurisdiction to review the Commissioner's decision not to reopen a prior application exists in two limited circumstances: (1) a colorable constitutional claim is raised, or (2) the decision is reconsidered to any extent at any administrative level." *See Loudermilk v. Barnhart,* 290 F.3d 1265, 1268, (11th Cir. 2002); *accord Macon v. Sullivan,* 929 F.2d 1524, 1529 (11th Cir.1991) (holding that jurisdiction will exist in cases where "a social

security claim is in fact reopened and reconsidered on the merits to any extent on the administrative level"). Plaintiff has not shown that either ground for reviewing the ALJ's refusal to reopen exists here. The ALJ specifically noted that lack of good cause for reopening the first application, and the Appeals Council neither agreed to reopen the first application nor addressed any issues other than whether he was a Cuban/Haitian entrant as of the date of his second application. No colorable constitutional claim has been alleged or shown.

8. Nodarse argues that this Court should still accept Nodarse's § 501(e)(2) argument because he was lawfully in the country in February 8, 2001, as a Cuban/Haitian entrant under § 501(e)(1), when he filed this action and had been lawfully in the country as of August 22, 1996, as a Cuban/Haitian entrant under § 501(e)(2). He claims that these two findings would make him eligible for indefinite benefits without requiring any reference to the first SSI application. However, the second suggested finding would still require the Court to reverse the Social Security Administration's determination on his 1999 SSI appli-

that Nodarse does not meet the alternative definition for a Cuban/Haitian entrant on August 22, 1996, under § 501(e)(2) of the REAA.

### Conclusion

After careful of consideration of the parties' objections, this Court concludes that the R & R's recommendation that Nodarse qualifies as a Cuban/Haitian entrant as of February 8, 2001, is well-reasoned. The Court also finds that the additional ground discussed above would justify a finding of eligibility for social security benefits as a Cuban/Haitian entrant under § 501(e)(1) of the REAA if he is found to be disabled. However, the Court finds that Nodarse was not a Cuban/Haitian entrant under § 501(e)(2) of the REAA at the time of his February 8, 2001 SSI application and that the Court is without jurisdiction to decide whether he qualified under that section as of August 22, 1996. Accordingly, after careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Magistrate Judge Dubé's R & R be AFFIRMED, ADOPTED IN PART, and MODIFIED consistent with this Order. It is further

ORDERED and ADJUDGED that the Plaintiff's Motion for Summary Judgment [DE # 19] is GRANTED and Defendant's Motion for Summary Judgment [DE # 25] is DENIED. The case is remanded to the Social Security Administration and appropriate state agency for further proceedings consistent with this Order. The Clerk of the Court is directed to mark this case CLOSED and DENY all pending motions as moot.

---

cation that Nodarse was not in deportation proceedings in 1999 and, therefore could not qualify as a Cuban/Haitian entrant in the years up to and including the date of that application. Thus, any consideration of that

## REPORT AND RECOMMENDATION

DUBE, United States Magistrate Judge.

THIS CAUSE is before the Court on the Motion for Summary Judgment filed by the Plaintiff (D.E.# 19) and the Motion for Summary Judgment filed by the Defendant (D.E.# 25) pursuant to an Order of Reference entered by the Honorable Paul C. Huck, United States District Judge. The Court has reviewed the motions, the file in this cause and has heard argument of counsel. The issue in this case is whether Plaintiff Ernesto Nodarse ("Nodarse") was properly found to be ineligible for supplemental security income benefits based on his alien resident status.

### I. DISCUSSION

#### A. The Applicable Law

The resolution of the Motions for Summary Judgment before this Court involves the interaction between several laws providing for the classification of persons entering the United States. In particular, the focus is on how a person is classified as a "Cuban–Haitian entrant" and how that categorization impacts the entitlement to benefits.

The starting point in analyzing the issues presented is the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), which essentially provides that an alien who is not a "qualified alien" is not eligible for any Federal public benefit. 8 U.S.C. § 1611(a). There are several definitions of "qualified alien" found in this Act, including an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act, and "an alien who is a Cuban and

---

issue would still violate the prohibition on reviewing such a decision more than sixty days after entry of a final decision and without first requiring exhaustion of administrative appeals.

Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980)." 8 U.S.C. § 1641(b)(1); (b)(7).

Even if someone is a "qualified alien" they are generally not eligible for Social Security Income benefits. However, there are exceptions to this exclusion, including one for "Cuban/Haitian entrants." 8 U.S.C. § 1612. This category is further defined by reference to the Section 501(e) of the Refugee Education Assistance Act of 1980 (REAA) which states as follows:

(e) As used in this section, the term "Cuban and Haitian entrant" means-

(1) any individual granted parole status as a Cuban/Haitian Entrant (Status Pending) **or granted any other special status subsequently established under the immigration laws for nationals of Cuba or Haiti, regardless of the status of the individual at the time assistance or services are provided;** and

(2) any other national of Cuba or Haiti-

(A) who-

(i) was paroled into the United States and has not acquired any other status under the Immigration and Nationality Act[this chapter];

(ii) is the subject of removal proceedings under the Immigration and Nationality Act [this chapter]; or

(iii) has an application for asylum pending with the Immigration and Naturalization Service; and

(B) with respect to whom a final, nonappealable, and legally enforceable order of removal has not been entered.

(Emphasis added).

The final enactment involved in the resolution of the pending matter is the Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub.L. No. 105–100. Section 202 of that Act, which applies to Nicaraguans and Cubans, states that an alien who is a national of Cuba "and who has been physically present in the United States for a continuous period beginning not later than December 1, 1995, and ending not earlier than the date the application for adjustment under such subsection is filed," can apply for an adjustment of status to "an alien lawfully admitted for permanent residence." *See* Pub.L. No. 105–100 § 202, 8 U.S.C. § 1255 note.

The interpretation of these provisions and the interplay with the facts of this case will be addressed below.

## B. Statement of Facts and Arguments Raised

Nodarse filed an application for Supplemental Security Income which states that he is lawfully admitted for permanent residence under the Immigration and Nationality Act. (R. 67).[1] This application was denied based on the fact that Nodarse was not a United States citizen or national or in any of the alien eligibility categories. (R. 41). Nodarse filed a Request for Reconsideration (R. 48) which was also denied. (R. 50). The Plaintiff then filed a Request for Hearing by an Administrative Law Judge (R. 55).

After reviewing the case, the ALJ issued a decision finding that Nodarse was eligible for supplemental security income based on his status as a Cuban–Haitian entrant. (R. 31–35). In reaching this conclusion, the ALJ reviewed the applicable law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); the Refugee Education Assistance Act of 1980 (REAA) and the Nicaraguan Adjustment and Central American Relief Act (NACARA), as set out above.

---

1. "R" refers to the Administrative Record filed by the Defendant (D.E.# 15).

The ALJ found that the Plaintiff met the definition of "qualified alien" at the time of filing his application, since he was already a lawful permanent resident. This determination led to the second issue whether the claimant met one of the exceptions under the law to preclude a five-year ban of receipt of federal public funds for a "qualified alien." In examining the applicable facts, the ALJ concluded that the evidence supported the finding that Nodarse was a Cuban–Haitian entrant, and thus, was eligible for public benefits for the first seven years of having that status. (R. 33–34).

In support of this conclusion, the ALJ noted that Nodarse's Permanent Resident Card reflected that he was from Cuba and that he had an NC6 category, indicating that he "adjusted to lawful permanent residency (LAPR status) based on NACARA legislation." (R. 34). According to the ALJ, this satisfied the definition under the REAA for a "Cuban–Haitian entrant." The ALJ explained this determination as follows:

This is so because NACARA legislation specifically includes Cubans as members of a special class of alien that can apply for adjustment solely on the basis of the time in which they have been in the United States. More specifically, adjustment to lawful permanent residency status is contingent on being Cuban and having been in the country.

Since Cubans were specifically added to immigration legislation allowing adjustment, they have attained a "special status subsequently established for nationals of Cuba."

(R. 34).

The Acting Regional Commissioner subsequently recommended that the Appeals Council review the decision of the ALJ on its own motion. (R. 14). In support of this request, the Commissioner pointed to a "State Letter" (SLOO–17) issued by the Office of Refugee Resettlement. This "State Letter" is attached to the request, and contains a section entitled "Acceptable documents for Cuban and Haitian entrants, in accordance with the requirements in 45 CFR § 401.2." This title is followed by a sub-title of "Any individual granted parole status as a Cuban/Haitian Entrant (Status Pending) or granted any other special status * subsequently established under the immigration laws for nationals of Cuba or Haiti, regardless of the status of the individual at the time assistance or services are provided." The note designated by the asterisk in the sub-title, which was the focus of the argument contained in the Commissioner's letter to the Appeals Council, states as follows:

> ***Note.** ORR is not interpreting the phrase, "any other special status subsequently established under the immigration laws for nationals of Cuba or Haiti" to refer to lawful permanent residence obtained under the Nicaraguan Adjustment and Central American Relief Act (NACARA) or the Haitian Refugee Immigration Fairness Act (HRIFA). Although NACARA and HRIFA offer a special opportunity for nationals of Cuba and Haiti, the **status** conferred by these laws, **lawful permanent residence**, is not a "special status." Thus, if the person did not qualify as a Cuban and Haitian entrant, adjustment of status, regardless of the legal basis for the adjustment, does not make the person a Cuban and Haitian entrant.

(R. 21)(emphasis in original).

The Appeals Council agreed to accept review, and requested further briefing from the Plaintiff. (R. 11). The Appeals Council then reversed the ALJ, finding that Nodarse was not eligible for payment since he did not meet the appropriate alien resident status. (R. 7–10). In reaching this determination, the Appeals Council

found that the record shows that Nodarse was a Cuban Citizen who entered the United States in October, 1988 without inspection; that his request for asylum was denied; that he was lawfully admitted to the United States on January 24, 2001 and that INS has not classified him as a Cuban/Haitian entrant.

While the Appeals Council agreed that Nodarse was a qualified resident alien, it further determined that in addition to not having the Cuban/Haitian entrant status, he did not meet any of the other special requirements for eligibility for supplemental security income. Thus, Nodarse was not eligible for supplemental security income for a period of five years after his legal entry into the United States. (R. 8).

The Plaintiff raises two alternative arguments in support of his contention that he is entitled to receive social security benefits. First, that he is a Cuban/Haitian entrant prior to August 22, 1996, and secondly, that he is a Cuban/Haitian entrant by adjustment under NACARA. However, it appears that the first argument was never raised in the proceedings below and was never addressed by either the ALJ or the Appeals Council. Accordingly, this issue will not be addressed by the Court.

The main argument raised by the Plaintiff and that addressed below, concerns the application of NACARA to the definition of Cuban/Haitian entrant found in the applicable laws cited above. The Defendant's reluctance to find that adjustment under NACARA constitutes a "special status" which would give rise to an entitlement to benefits is based mainly on the State Letter from the Office of Refugee Resettlement. This Court agrees with the arguments raised by the Plaintiff concerning the limited purpose of the State Letter and the incorrectness in giving it the level of deference afforded by the Defendant.

The clear language of the definition found in the REAA, as quoted above, shows that a Cuban/Haitian entrant includes anyone granted any special status established under the immigration laws for nationals of Cuba or Haiti. This is precisely what was accomplished by the application of NACARA to the Plaintiff. *See also, Pinho v. Immigration and Naturalization Service,* 249 F.3d 183 (3rd Cir. 2001). The strained interpretation put on the terms by the Office of Refugee Resettlement State Letter should not overcome the plain meaning of the law, as was correctly found by the ALJ below. Accordingly, Nodarse should be seen as a Cuban–Haitian entrant and thus, eligible for an award of Supplemental Security Income benefits.

Based on the foregoing, it is the recommendation of this Court that the Motion for Summary Judgment filed by the Plaintiff (D.E.# 19) be **GRANTED** and that the Motion for Summary Judgment filed by the Defendant (D.E.# 25) be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) days from service of this Report and Recommendation to serve and file written objections, if any, with the Honorable Paul C. Huck, United States District Judge. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1988), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993).

Dated Jan. 14, 2004.